No. 60.—DANIEL HARRIS, administrator, &c. plaintiff in error, *vs.* WILLIAM SMITH, executor, defendant.

[1.] A testator gave real and personal estate to D F H, with the provision that if he should "die leaving no lawful heirs, then, in that case, it is my will that all of the said property shall be divided, share and share alike, between the children of J C F": *Held*, that these words vested in D F H an estate in fee, subject to an executory devise of the lands, and bequest of the personal property in favor of the children of J C F, if the said D F H should die without children living at the time of his death.

In Equity, in Washington Superior Court. Decision by Judge HOLT.

In 1840, Cordal N. Francis made his will and died, leaving defendant, Smith, his executor, and his wife Nancy and his grand-son Daniel F. Harris, him surviving.

By his will he disposed of a large estate to his children, grand-children and others. By the first and fourth items of that will he devised as follows:

"*Item 1st.* It is my will and desire, and by these presents

I do give in trust to my beloved wife, Nancy Francis, during her life-time and widowhood, all those tracts or parcels of land lying on the south prong of Williamson Swamp, in the County of Washington and State of Georgia, this being lands which I purchased of the Perrys, John Davis, Lewis Davis, and Elias Lee, containing about nine hundred and twenty two acres, be the same more or less, adjoining lands of James Gainer, Charles Sheppard, Anderson Riddle, and Mrs. Dioclission Davis. Also all the stock of horses, cattle, sheep, hogs and provisions of every description, together with all the plantation utensils, of every kind, that may be on said plantation of mine, at the time of my decease, together with a road-wagon and harness, one ox-cart, one pair of oxen; also one still, to be taken from the plantation whereon I am now living. And it is also my will and desire that my executor, hereafter named in this my last will and testament, shall cause to be built, as early as practicable after my decease, on the above-named tract of land, a dwelling house for the use of my wife Nancy, during her lifetime and widowhood, and for which I hereby appropriate one thousand dollars for that purpose; but I want it particularly understood by my executors, that it is my wish and desire that my beloved wife is not to be turned out of the house she is occupying, but she is to have the entire use of it until the other house is completed and ready for her reception. Also, I loan the use of the following slaves, *to-wit:* Solomon, big Harry, Hannah, Nat, Nelly, Creasy, Lucy, Betty, Matilda, Sam, little Sarah, Sterling, Newton and Joe. All the mentioned property in this item, first is loaned or given to my beloved wife, as above stated, during her lifetime and widowhood, and after her death or marriage, then in either case, the said property to be given as I shall hereafter direct in this my last will and testament.

*Item* 4*th.* It is my will and desire, and by these presents, to give unto my beloved grand-son, Daniel F. Harris, after the death or marriage of my beloved wife, all the property in which I have loaned to my wife during her natural life or widowhood, as will be seen by reference to the first item of this my last will and testament; provided, nevertheless, if my said grand-son

should die leaving no lawful heirs, then, in that case, it is my will that all of the said property named in this item, revert back to my estate, and to be divided equally, share and share alike, between the lawful children of my son James C. Francis.

Daniel F. Harris was son of complainant's wife, who was the daughter of testator, and he died before his grand-mother Nancy, wife of testator, never having married, and leaving his father, the complainant, and several brothers and sisters him surviving, and his heirs at law. Subsequently, his grand-mother, the tenant for life, died in possession of the property, and of which Smith, defendant, took immediate possession, as executor of testator, Cordal N. Francis, and against whom this bill was filed by Mr. Harris, as administrator of his son, Daniel F. Harris, for an account and surrender of the estate, that he may distribute it among the next of kin of his intestate, in whom an unconditional fee-simple vested, as he contends, by the laws of the land.

To this bill a general demurrer was filed, in the argument, of which two main grounds were relied on :

1st. That Daniel F. Harris having died before his grand-mother, he took no interest under the will; that the testator only willed him to have the property if he survived her, but made no direct bequest; and as he did not survive her he took nothing—no interest vested.

2nd. If any interest did vest, the same was subject to a reversion, dependent on his dying without children; that as such contingency happened, the reversion took effect, and the estate went back to the ultimate remainder-men, the children of James C. Francis.

The Court sustained the demurrer and dismissed the bill; and on this decision error is assigned.

Bailey; Schley, for plaintiff in error.

Rockwell, for defendant.

*By the Court.*—STARNES, J. delivering the opinion.

[1.] It is insisted for the plaintiff in error, that in the dis-
position which this testator must be held to have made of the
property, by the *fourth clause* of his will bequeathed, he in-
tended to give the same, after the estate in his wife should ter-
minate, to his grand-son, Daniel F. Harris, in fee tail. That
such intention is, in legal contemplation, manifested by the use
of words in the latter part of that clause, which have reference
to an indefinite failure of issue in the line of that grand-son's
posterity, and which thus bring the case within the rule against
perpetuities. That, as a consequence, by virtue of the first
section in our Act of 1821, an absolute, unconditional fee-sim-
ple vested in Daniel F. Harris; and his administrator is enti-
tled to recover the property from the defendant in error.

The first part of this fourth clause gives the property speci-
fied, after the death or marriage of the testator's wife, to his
grand-son; and the second part is in the words following : " Pro-
vided, nevertheless, if my said grand-son should die, leaving no
lawful heirs, then, in that case, it is my will that all of the said
property named in this item shall revert back to my estate and
be divided, share and share alike, between the lawful children
of my son, James C. Francis".

We propose to consider, first, the effect and value of the
words, "if my said grand-son should die, leaving no lawful
heirs" ; for these are the words which, it is argued, import an
intention to create a perpetuity.

Touching such expressions as " dying without issue", or "in
default of issue or heirs", or "having no issue," &c. the set-
tled construction, in the Courts of England, for a great
length of time has been, that they import *an indefinite failure
of issue.* But in conveyances of personal property, where the
words are "dying without *leaving* issue", the word "leaving",
by an equally well settled construction, has been held to mod-
ify the other expressions, so that they mean a dying without
issue *at the death.*

Harris, administrator, &c. *vs.* Smith, executor.

It is urged, however, for the plaintiff in error, that the first section of our Statute of 1821, in effect, repeals this liberal construction, as to personal property, in our State, and puts it on the same footing with real property, in this respect; that the true meaning of this section is, that though the conveyance be of personal property, yet if it be expressed in such terms, as by the Statute *De Donis, &c.* would create an estate tail in real property, the same construction must be applied as if the conveyance were of real estate in England; and that by the terms of our Statute, an absolute fee-simple will vest in the first taker.

We will waive a consideration of this point, and admit, for this investigation, that it is maintainable, inasmuch as there is real estate conveyed by the words of this will, and it became necessary for us to consider them with reference to such conveyance; and inasmuch as such consideration has strongly inclined our minds to the opinion, that in our State, the rule of construction which has been applied by the English Courts to such words, even as to real estate, should not be supported.

We are aware that the proposition is a bold one—that from the time of the Year Books to the present day, the construction has been different in England, and that the Courts in the United States, generally, have followed those decisions. We are not without that deep reverence for case and precedent which marks our profession, and manifests the careful and cautious spirit in which those should always proceed, whose vocation it is to administer human laws. And we are properly mindful that titles are endangered when precedent is recklessly disregarded; yet, after much thought and labor, we have been unable to take any other satisfactory view of this subject, as it presents itself under our system of laws.

To come at once to the point: Let us admit that our Act of 1821 holds us to the Statute of *Westminster*, commonly called *De Donis, &c.* as the touchstone of those terms which shall constitute or pass an estate tail. And the more advantageously to consider this subject, let us look to some features in the history of that Statute. That history bears fruitful evidence

to the struggle which has so long been going on between what is rightly called "the true policy of the Common Law", and the baronial or feudal system.

It was the policy of the feudal lords to convey lands by way of *conditional* fee, or so as to restrain that fee to a particular class of heirs; and in default of such heirs, to provide that the same should revert to the grantor, where it could be made still to subserve feudal purposes. In opposition to this policy of the barons, such a conveyance was construed, at Common Law, to be a fee-simple, on condition that the grantee should have the heirs prescribed; and if the grantee died without such issue, the land reverted to the grantor: but if he had the specified issue, the condition was held to be performed—the estate became absolute, and the grantee could alien the land to the exclusion of his own issue. To defeat this construction and contrivance of the Courts, the feudal lords passed, or caused to be passed, the Statute 13 *Edw.* 1, *c. I.* which is known as the Statute of *Westminster Second,* or *De Donis Conditionalibus.*

This Statute declares, that where land is given "to (1.) any man and his wife, and to the heirs begotten of the bodies of the same, with such condition expressed, that if the same man and his wife die without heirs of their body, the land so given shall revert to the giver or his heir. (2.) In case, also, where one giveth lands in free marriage, which gift hath a condition annexed, though it be not expressed in the deed of gift, that if the husband and wife die without heir of their bodies begotten, the land so given shall revert to the giver or his heir. (3.) In case, also, where one giveth land to another, and the heirs of his body issuing, it seemeth very hard, and yet seemeth to the givers and their heirs that their will being expressed in the gift, was not heretofore, nor yet is observed. (4.) In all the cases aforesaid, after issue begotten and born between them, (to whom the lands were given under such condition,) heretofore, such feoffees had power to alien the land so given, and to disinherit their issue of the land, contrary to the minds of the givers, and contrary to the form expressed in the gift. (5.)

And further, when the issue of such feoffee is failing, the land so given ought to return to the giver or his heir, by form of the gift expressed in the deed, though the issue (if any were) had died: (6.) Yet, by the deed and feoffment of them, (to whom the land was so given upon condition) the donors have heretofore been barred of their reversion, which was directly repugnant to the form of the gift: Wherefore, our Lord the King, perceiving how necessary and expedient it should be to provide remedy in the aforesaid cases, hath ordained that the will of the giver, according to the form in the deed of gift manifestly expressed, shall be from henceforth observed, so that they to whom the land was given under such condition, shall have no power to alien the land so given, but that it shall remain unto the issue of them to whom it was given, after their death, or shall revert to the grantor or his heirs, if issue fail, (in that there is no issue at all) or if any issue be and fail by death, or heir of the body of such issue failing, &c. (1 *Ruffh. Stat. at L.* 78.)

In order that it may plainly appear that the signification of such words as "dying without issue or heirs," &c. which has prevailed in the Courts of England, is the result of construction, and not of the accurate terms of this Statute, I call attention to its several provisions, which I have for this purpose set forth at large. 1. Reference is made to the case, where land is given to any man and his wife, and to the heirs begotten of the bodies of the same man and his wife, with condition that if the same man and his wife die without heirs of their bodies *between them, the same man and woman, begotten*, the land so given shall revert to the giver or his heir. 2. Where land is given in free marriage, &c. with condition annexed, that if husband and wife die without heirs of their bodies begotten, the land so given shall revert to the giver, &c. 3. Where one giveth land to another and the heirs of his body issuing. 4. In such cases, after issue begotten and born between them, to whom the lands were given upon condition, the feoffees had power, heretofore, to disinherit their issue, contrary to the minds of the givers, &c. 5. And further, when the issue of

such feoffee has failed, (*deficiente exitu*) the land ought to return to the giver by the form of the gift; yet, by the deed of the donee, the donors have heretofore been barred of the reversion: Wherefore, it was enacted, that the will of the giver, manifestly expressed, should be henceforth observed, so that the land thus given should remain unto the issue of them to whom it was given, after their death, or revert to the giver or his heirs, *if issue fail where that there is no issue at all*, (*per hoc quod nullus sit exitus omnino*,) or *if any issue be and fail by death; or heir of the body of such issue failing*.

We thus see, that there is nothing in the Statute which sanctions the idea, that when one was said to *die without issue or heirs*, reference was had to a failure of issue at any remote time after his death.    On the contrary, wherever, therein, reference is made to a dying without issue or heirs, the Statute clearly shows that it is intended as a reference to such failure, *at the death;* and as if to make it very plain, that the words used were intended to be employed only in their natural signification, in the last clause which I have just given and emphasized, the two things, viz: a failure of issue at the death of the ancestor, and a remote or indefinite failure are brought into immediate juxtaposition, and carefully expressed in the first by the words : " *if issue fail, (where that there is no issue at all*,) *or if issue be*, and fail *by death*," and the second by the words: " *or heir of the body of such issue failing*".

As if the Courts were at intervals swayed from side to side, in the contest to which we have referred, between the feudal policy and the credit and commerce of the Kingdom, we find them, after having, by their strong proclivity in favor of the policy of unfettering estates, compelled the barons to resort to this Statute next inclining towards the feudal influences, and adopting an artificial construction of words for the purpose of bringing them within the terms of this Statute.    Again, we find them favoring the principles of the Common Law, and the interests of commerce, and resorting even to slight expressions in the instrument before them, for the purpose of holding that

these modify the strong signification of words referring to a particular class of heirs, or an indefinite failure of issue.

And we may remark in passing, that it is in this very condition of influences, that that thick mist of conflicting opinions and confusion of ideas, which hovers over the current of cases in which the rule in Shelly's case has been discussed, has its origin.

As we have said, there can be no doubt that the construction placed by the Courts upon such words as those used in this will, viz: "should he die leaving no lawful heirs", from a very early period, has been that in conveyances of real estate, they imported an indefinite failure of issue. It may be doubted, whether or not this was the construction first applied, yet the Year Books seem to show, that at a period not very remote from the passage of the Statute *De Donis*, this construction was adopted. Still it is but a *construction* of the Courts. It is not the natural, legitimate, and idiomatic signification of the words. It is not what the Statute speaks, but what the English Courts *have said* the Statute speaks. We have ascertained this for ourselves, by a critical examination of the Statute; but to the point we have the testimony of the most eminent English Lawyers and Judges.

Lord *Macclesfield* tells us, for example, in the case of *Pinberry vs. Elkin* (1 *P. Wm.* 563,) "by the third sense of a person's *dying without issue*, is intended *without leaving issue at the time of his death*, and in this sense the words (dying without issue) shall be taken in the principal case; which indeed seem to be *the natural' meaning of these words*".

Mr. *Jarman* says, that "in ordinary language, when a testator gives an estate to a person and his heirs with a limitation over, in case of *his dying without issue*, he means that the devise, shall retain the estate, *if he leaves issue surviving him*". But he goes on to say, that the legal or constructive meaning is different". (2 *Jarm. on W.* 316.)

Mr. *Lewis* in his excellent treatise on *Perpetuities*, informs us, that " although such is the legal construction of the words

' dying without issue', unaccompained by any restrictive expressions or circumstances, there can be no question, that according to the common and ordinary idiom and construction of the English language, independent of any technical rules, which have been applied to the interpretation of legal instruments, those words imply a failure of issue living at the time of the death of the ancestor".

In the case of *Attorney General vs. Hird,* (1 *Brow. C. C.* 170) where the words were, "to B. and the lawful heirs of his body, if he should have any, but if he should die without lawful heirs to Lady S.," Lord *Thurlow,* following the rules of construction in England, and feeling himself bound by them, decided that the limitation over was too remote, but he added, " I am sorry that the Judges have thought themselves bound to construe wills contrary to their own opinions of the intent. The words, if construed here, otherwise than they have usually been, would *overturn the rules of construction, though not the rules of law*". Here, it will be observed, is a frank and bold admission that this construction was not demanded by the law, that is, by the terms of the Statute *De Donis, &c.*

While reviewing the decisions on this point, we find, that in some cases, where the same words in the same instrument, as to the real estate therein conveyed, have been held to import an indefinite failure of issue, so far as the personal estate was concerned, they have been held to import a failure of issue, at the death of the ancestor. For example, where the words are " dying without leaving issue," there, since the case of *Forth vs. Chapman,* (1 *P. Wm.* 663,) it has been the settled doctrine, that the word "leaving," so modifies the expression, that applied to personal estate, it imports a failure of issue at the death, even where the real and personal estate is comprised in the same gift. And this rule is sustained by a long train of decisions. (See *the cases cited at* 2 *Jarm.* 419.) But how is it possible that this double meaning—this esoteric and exoteric signification, as it were, can belong to the same terms of the same law ? This cannot be reconciled with reason ; and hence, as Lord *Thurlow* says, the *legal* or *conventional* signification

of such words depends, rather on "the rules of construction," than "the rules of law".

We find, too, that in some cases, the Courts have endeavored to avoid a signification so opposed to the plain meaning and intention of the giver, even where such words have been applied to real estate, and have anxiously cast about for the slightest expressions on which they might seize, as a pretence for a different construction.   We may take as an illustration of these, the case of *Porter vs. Bradley*, (3 *T. R.* 143,) where the words were, if he "shall happen to die, leaving no issue behind him". There, Lord *Kenyon* availed himself of the words, "behind him," as modifying the expression and affording a reason for a different construction; as if one could die, *leaving issue*, in any reasonable sense of the term, without leaving them *behind him.* So, in the recent case *Ex parte Davies in re The W. S. & W. Railway Co.* (9 *Eng. L. & Eq. R.* 88,) where a testator gave property, both real and personal, to his son, and in case his son should die without leaving any lawful issue of his body, the freehold should, *at his death*, be divided and go to another son and daughter.   Here the words, *at his death*, were held to qualify the other expressions, and to show that the testator had reference to a dying without issue, at the time of the son's death.

Though all this be true, we admit that this legal construction, as a principle well settled by adjudications in England at the time of our adopting Statute, is binding on us, unless it has been repealed.   But we have taken some pains to show, that this rule was the result of construction, and not language of the Statute *De Donis*, because, it seems to us, that as such, it has been repealed in our State.

To show this, we must ascertain the reason for the rule.   It will not be difficult to do so.   It must spring, of course, from the same source out of which arise the estate tail and the perpetuity.   Its remote ancestry was of feudal pedigree, its immediate progenitors, the interests of the heir at law.   We find this to be so, wherever we look to the history of this question. What Mr. *Lewis* says on this subject, however, will suffice for

our purpose, viz: that "in every case of a limitation of real estate, after or upon the failure of issue of a person (whether taking a prior estate or not) the law leans to the construction of a *general or indefinite failure,* as opposed to one limited to happen within a particular time. And the reason assigned for this inclination is, that in all cases of doubt in regard to the construction of limitations, that is to be preferred which most favors the interests of the heir at law." (*Lewis on P.* 191.)

But in our State, primogeniture has been abolished, and there is technically no heir at law—real and personal estate, for purposes of distribution, have been placed upon the same footing, and estates tail have been prohibited. Therefore, the reason for the conventional rule of construction which we have been considering, and on account of which these words, now under review, have been wrested from their natural meaning, has been repealed. Should not the rule fall within the reason?

It surely should, unless, as a Court sitting in Georgia for the trial of a case arising out of an instrument in this State executed, when called upon to expound the will of the maker ("the giver") "according to the form of the gift manifestly expressed," we should look to the policy and the law of England, where estates are lawful and primogeniture exists, (as serving to illustrate the meaning of the "giver", and rendering it probable that he contemplated an indefinite failure of issue) which policy and law have been changed and repealed in our State, rather than to the circumstances by which the giver was surrounded at the time the instrument was executed, as they may have been influenced by the laws of the place where he designed it to go into effect.

But should we be wrong in all that we have said, still there is another feature in the latter part of the fourth clause of the testator's will which is opposed to the idea that he contemplated an indefinite failure of issue in the line of his grand-son's posterity. It is found in the use of the words, "then in that case," &c.

The terms employed are, "provided, nevertheless, if my said grand-son should die, leaving no lawful heirs, *then, in that*

Harris, administrator, &c. *vs.* Smith, executor.

*case,* it is my will" that the property be divided between the children of James C. Francis, &c.

Now the word *then* may be used, either as a word of reason-- ing or of time.    When it is used in the limitation of estates, or in framing contingencies, unless something in the context makes a diffcrent meaning for it necessary, it is to be regarded as Lord *Hardwick* says in *Beauclerk vs. Dormer,* (2 *Atk.* 311,) as a word of reference: but it *may be* used on such occasions, in its grammatical sense; that is, as an adverb of time.    In such case, the context should plainly show that it was so used, before effect is thus given to it.    When it is employed in the former sense, it is synonymous with the phrase, "in that event"; or, "in that case", when in the latter, with the words, "at that time".    (2 *Jarm.* on *W.* 446.)

In the case of *Beauclerk vs. Dormer,* Lord *Hardwick* re- fused to consider this word in its grammatical sense, but treat-- ed it as a word of inference or reasoning, because there was nothing in the context to authorize it.

In the sentence before us, the word is plainly used as an adverb of time, because it is in immediate juxtaposition with the phrase, "in that case".    To give it as here used, a differ- ent construction, would be to consider the testator as using it twice, consecutively, in the same sense, or as having no mean- ing for it, when thus using it: whereas, if we construe it as a word of time, we represent the testator as simply saying, "if my grand-son should die, leaving no lawful heirs, *in that* case, *at that time,* it is my will that the property should be divided," &c.    This carries every material word of the will into effect, and gives an entirely reasonable interpretation to the same. It is the duty of Courts to do this at all times, when it can be done *ut res magis valeat, &c.*

But, if the testator intended the bequest over to take effect, should his grand-son leave no lawful heirs *at the time of his death,* and had reference, consequently, to a dying without issue, *at that time living,* he could not, of course, have contemplated a perpetuity, nor have intended to create an estate tail.    This

being made plain, it is very clear that the words *lawful heirs* were employed by the testator in the sense of children.

It only remains to say, that the result of these views is, that in our opinion the testator gave to his grand-son a remainder in the real and personal estate conveyed by the first clause of his will to his wife for life, the same to be taken in fee by his said grand-son (for by the first part of the said fourth clause of the will, construed as it must be with reference to the second section of our Statute of 1821, an absolute fee simple estate vested in Daniel F. Harris) subject to an executory devise of the lands and bequest of the personalty to the children of James C. Francis, if the said Daniel F. should die without children living at the time of his death.