Hollifield, adm'r, &c. *vs.* Stell.

No. 52.—GEORGE W. HOLLIFIELD, adm'r, &c. and others, plaintiffs in error, *vs.* JOHN D. STELL, defendant in error.

[1.] One of the items in the last will and testament of Tobias Lasseter was as follows: "I likewise give to my son, Hardy Lasseter, a negro woman named Kate; and in case the said Kate shall bear a child to live to the age of two years, my desire is that my daughter, Christina Lasseter, may be possessed of it; and in case the said Christina "*should die without an heir of her body,*" then the said child to be sold and the money equally divided between the three eldest brothers and their sister, namely: Benjamin Lasseter, Jesse Lasseter, John Lasseter and Rebecca Lasseter": *Held,* that the words of this bequest *ex vi. termini,* import an estate-tail; and there being nothing explanatory annexed to restrict their meaning, an absolute fee, under the Act of 1821, was vested in Christina Lasseter, in the child of Kate and its increase.

Trover, in Fayette Superior Court.   Tried before Judge O. WARNER, September Term, 1854.

The sole question in this case arose upon the following clause in the will of Tobias Lasseter: "In case the said Kate (a negro woman) shall bear a child, to live to the age of two years, my desire is, that my daughter Christina Lasseter may be possessed of it; and in case the said Christina should die without an heir of her body, then the said child to be sold, and the money equally divided between the three eldest brothers and their sister, namely: Benjamin Lasseter, Jesse Lasseter, John Lasseter and Rebecca Lasseter." Kate had a child which reached two years of age. Christina went into possession of it, and died without leaving child or children. This action was brought by the persons to whom the estate was limited. The Court held, that under this clause, Christina took an estate tail; and this decision is assigned as error.

BUCHANAN; MCKINLEY; TIDWELL & FULLER, for plaintiff in error.

STELL; WARNER, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] This was an action of trover, brought by the plaintiffs in error against the defendants in error, to recover a number of slaves therein enumerated. The plaintiffs relied, for their title on the will of Tobias Lasseter, made in 1801, and admitted to probate in Greene County in 1804. It contains, amongst other things, the following item: "I likewise give to my son, Hardy Lasseter, a negro woman named Kate, and in case the said Kate shall bear a child to live to the age of two years, my desire is, that my daughter, Christina Lasseter, may be possessed of it; and in case the said Christina should die without an heir of her body, then the said child to be sold and the money equally divided between the three eldest brothers and their sister, namely: Benjamin Lasseter, Jesse Lasseter, John Lasseter and Rebecca Lasseter." It is admitted that a female child was born to the woman Kate bequeathed to Hardy Lasseter; that it went into the possession of Christina Lasseter, and that the said Christina died "*without an heir of her body.*" Under these facts, the plaintiffs claimed the negroes descended from the child of Kate as remainder-men under the will of Tobias Lasseter; which claim is resisted upon the ground that the limitation over in this property is too remote; and that in consequence thereof, Christina Lasseter took an absolute fee under the laws of this State, in the slaves. And such was the judgment of the Circuit Court; which decision is excepted to; and this writ of error is prosecuted to reverse the same.

Before proceeding to examine the bequest in this will, it may not be amiss to glance at our own legislation upon this subject. The Constitutions of 1777 and 1789 prohibited estates tail. By oversight or otherwise, no such provision was contained in the Constitution of 1798. But by the Judiciary Act of 1799, estates-tail are forbidden.

Doubts having arisen as to the true and proper construction

of the compendious provision in the Act of 1799, that "estates shall not be entailed," and a contrariety of judicial decision having obtained in consequence thereof, some of the Courts holding that conveyances for fee-tail were absolutely void—others, that they vested a fee-simple estate in the persons to whom they were executed—and others again, that they vested only a fee conditional at Common Law. The Legislature, in 1821, passed an Act to remedy this mischief; the first section of which declares, "that all gifts, grants, bequests, devises and conveyances, of every kind whatsoever, whether real or personal property, made in this State and executed in such manner or expressed in such terms as that the same would have passed an estate-tail in real property by the Statute of Westminster Second, (commonly called the Statute *de donis conditionalibus*) be held and construed to vest in the person or persons to whom the same may be made or executed, an absolute, unconditional fee-simple estate." (*Cobb's Digest*, 169.)

I will not stop to criticise the language of this Act. It is obvious to any lawyer, however, that the expression " as that the same would have passed an estate-tail" *in real property*, by the Statute of Westminster Second, is supererogatory, inasmuch as that Statute did not embrace *personal property*.

I would remark, that the Act of 1821 was *declaratory*, and is to be so interpreted ; and it is precisely the same as though the first section which I have quoted, was incorporated with and made a part thereof by way of addition to the 5th section of the Act of 1799, so that the whole would read thus : " Estates shall not be entailed, and all gifts, grants, &c." In this view of it, therefore, the first section of the Act of 1821 extends as well to instruments made before its passage as since. In other words, it applies to all gifts, grants, bequests, devises and conveyances of every kind whatsoever, whether of real or personal property, executed since 1799.

. It is insisted that the Courts of this State, under this Act, are to apply the same rule of construction to deeds and wills, whether of real or personal property, which the British Courts

have placed upon similar instruments, under the statute *de donis* disposing of real estate.

If so, not one out of a hundred of the numerous adjudications made in this State, either before or since the organization of this Court can be sustained. The view uniformly taken by all the Courts of this State is this: while our Courts have felt constrained, by the stringent terms of the Act of 1821, to bring all cases to the test of the Statute of Westminster, they have not felt themselves bound by the construction put upon that Act in England, and for this most obvious reason. To favor the heir at law, the Courts there have wrested, confessedly, the words of the Statute from their natural signification and common sense meaning, and given to them an arbitrary and technical interpretation. Now not only no such motive exists here, for doing violence to the words of the Statute, but a contrary policy should obtain. In short, while we, in obedience to the mandate of the Legislature, enforce the Statute *de donis*, we read it as it is written, and not as the English Courts have made it, to subserve a particular purpose. And if this is not allowable, we must retrace our steps and over-rule, *uno flatu*, all that we and our predecessors have decided upon this subject, beginning with the case of *Atwell's executors vs. Barney*, (*Dudley's Rep.* 207) and coming down to *Williams vs. Allen*, decided a few days since at Columbus.

Nor are we without authority for this course. The English Courts, themselves, have in deeds and wills of personalty, construed words in their natural sense, and consequently have been driven to the necessity, I should say absurdity, of applying a different meaning to the same words in the same instrument, when it contained both realty and personalty.

Hence, in our opinion, this and like cases should be examined in the light of English decisions, as to personalty rather than as to realty; and that there is nothing in the Act of 1821 which concludes the Courts to a contrary course. It may be suggested, that by putting a rigid construction upon the Act of 1821, and applying the doctrine of the English Courts, as to realty, to all conveyances in this State, we should

untrammel property at once; and that instead of leaning against the Courts, should incline in favor of that view; that by converting the instrument into an estate tail, we do but declare it a fee simple under the Statute. And there may be something in this suggestion; still, we can hardly believe that it was the intention of the Legislature, by the Act of 1821, to prevent testators and others from rendering estates unalienable within the limits prescribed by law, to-wit: during a life or lives in being, and twenty-one years after, and a few months more, to provide for the case of a posthumous child. And the Act of 1854, in relation to the limitation over of estates, is confirmatory of this conclusion. (*Duncan's Digest*, 8.)

Take, then, the clause under consideration—" and if she die without an heir of her body, then," &c. And does it, in connection with the previous bequest to Christina Lasseter, technically and *propria vigore*, create an estate tail? A few reported cases may be found, perhaps, negativing this proposition. We are well satisfied, however, that the great current of authority is strongly the other way. Turn to *Davie's Abridgment, Conyer's Digest, Cruise's Digest, Fearne* or any of the standard elementary works, and under the head of estates in tail and devises, the cases cited, are so numerous and apposite, as to leave no earthly doubt but that the words of this will, of themselves, and without explanation, created an estate tail in Christina Lasseter; and therefore, under the Act of 1821, vested the fee simple in her. And it would be an absurd affectation of case-learning and adroitness in case-hunting, to cite authorities upon this subject.

Have words of explanation been annexed by the testator, in this will, which may control the technical phraseology which he has employed? Mr. *Hargrave* denies to the Courts the right to institute any such investigation, and insists, that the rule is a policy of the law, and that it is of a quality, rigid, stubborn, imperious, irresistible, and so indispensible as to be above all exception whatever; and that, firm and immovable in its claim of sole empire, and looking down on private intention as its lawful subject, the rule will neither give nor accept

Hollifield, adm'r, &c. *vs.* Stell.

of any terms of capitulation. (*Law Tracts*, 562, 574.) And that he would apply the rule, notwithstanding the party should express, in his will, that the rule should not be applied, and that the remainder to the heirs of the tenant for life, *should operate by purchase.* (*Ib.*)

Lord *Mansfield*, on the other hand, in *Perrin and Blake*, (6 *Cruise*, 389,) observed, that he always thought, that as the law had allowed a free communication of intention to a testator, it would be strange to say, "now you have communicated that intention so as every body understands what you mean; yet, because you have used a certain expression of art, we will cross your intention and give your will a different construction; though what you meant to have done is perfectly legal, and the only reason for contravening you is, because you have not expressed yourself like a lawyer."

The Courts in this country, at least, have followed the lead of Lord *Mansfield* and those Jurists who maintain that the legal intention, when clearly explained, shall control the legal sense of a term of art, unwarily used by the testator; that he shall be allowed, as it were, to correct the inaccuracy of his own phrase; that in the sturdy truism of Justice *Reynolds*, in old *Fitzgib.* 113, a man shall be permitted to speak his mind in his will.

And it may now be assumed as settled, that there is no form of words, such as "*heirs of the body*," "*dying without issue*," or any other sort, which will not yield to the manifest intention of the testator, provided that intent be consistent with law, and provided it be so fully expressed in the will itself; or else, may be collected from thence by such cogent and demonstrative arguments, as to leave no doubt, in any reasonable mind, whether it was his intent or not; and such was the opinion of Sir *William Blackstone*, in the admirable judgment which he delivered in *Perrin and Blake*, and which stands unrivalled as a specimen of Judicial composition. (*Har. Law Tracts*, 502, '3, '4, '7.)

1. The word "*then*," in this bequest, is relied upon as restricting the meaning of the words, "should die without an

heir of her body," to an heir *living at the death of Christina Lasseter.* Concede that the word "*then*" is an adverb of time, does it refer to the death of Christina Lasseter, or to the failure of the heirs of her body? The cases cited by the learned Counsel for the defendant in error, and others which might have been adduced, show conclusively, that it does not relate to the death of the daughter of the testator, and fixing that event as the time when the limitation over to the plaintiffs was to take effect. (1 *P. Wms.* 563. 7 *T. R.* 551. 2 *Atkin.* 507. 1 *Bro. Ch. R.* 174. 1 *Nott & McC.* 69. 1 *Hill's Ch. R.* 39.)

In most of the cases, this word is not considered or regarded as having any operation whatever, either by the Counsel or the Court; and whenever it has been relied on, it has been emphatically over-ruled.

2. It is contended, that the circumstance that the property is a *negro,* necessarily restricts the meaning of the words in the will, to an heir living at the death of Christina Lasseter. The prompt and proper reply, by the thoroughly prepared Attorneys of the defendant is, that in *Daviage vs. Chany,* 4 *Har. & McHen.* 393. *Matthews vs. Daniel,* 1 *Murphy,* 42. *Bryson vs. Davidson, Ib.* 143. *Guerry vs. Vernon,* 1 *N. & Mc.* 69. *Henry and Wife vs. Fielder,* 2 *Mc. Ch. R.* 323, *and Robinson vs. McDonald,* 2 *Kelly,* 120, and many other cases which might be enumerated, the subject of the bequests was negro property; and yet, the limitation over was pronounced void. And hence, it is legitimately concluded, that the nature of the property bequeathed, does not restrict the meaning of the technical terms.

3. Again, it is argued that the artificial language of this will, is restrained by the distributive disposition, that if Christina should die without an heir of her body, "then *the said child be sold and the money be equally divided between the three eldest brothers and sisters,*" *&c.* But upon this as upon every other point of attack, the assailants are met, and their blow parried by their adroit and skilful antagonists.

It is answered, and we think triumphantly, that it is only

when distributive words apply to heirs, as a class, and indicate a different species of heirs from those denoted by the words upon which they are engrafted, that they have a restrictive effect; that in the case at bar, they apply to the three sons and daughters of the testator, and not to a class of heirs.   They apply to the persons specifically named in the will, to whom the property was limited over, and not to the heirs of the body of Christina Lasseter.   If this had been a bequest to Christina Lasseter and the heirs of her body, to be equally divided among them, then, according to the ruling of this Court in *Tucker vs. Adams,* (11 *Ga. R.* 567,) and the established doctrine upon this subject, the words "equally divided," would have been words of restriction, because they would have denoted a different species of heirs from those denoted by the words, "heirs of her body."   It is only when the distributive words change the line of descent marked out for property, by the words upon which they are engrafted, that the latter are taken as words of purchase.   Here the fact is otherwise.   Consequently, the words, "should die without an heir of the body," must be taken as words of limitation, that being their technical meaning.

Lastly—it is said that the limitation over, in this case, being to persons who were in life at the execution of the will of Tobias Lasseter, effectually rebuts the inference, that an indefinite failure of issue was intended.

I hazard the assertion, that in more than three-fourths of the reported cases, from the year of 1285, when the Statute of Entailments, commonly called the Statute *de donis* was passed in the 13th year of King *Edward I.* down to the present time, the limitations which have been set aside, were to a person or persons in *esse.*   The earliest case to be met with under the Statute was of this sort, and was decided in the 35*th of Ed. III.* (*Pl.* 14.)   So in *Sanday's case,* (9 *Coke,* 127.)   So, also, in the case of *King vs. Rumball,* (*Cro. Jac.* 448.)   *Pell vs. Brown,* (*Cro. Jac.* 590.)   *Chadock vs. Cewley,* (*Cro. Jac.* 695.)   But I forbear to specify the cases.   They lie scattered

every where through the Books, " thick as the autumnal leaves. which shade the vale of Valambrosa."

And this disposes of all the words relied on in this will, to restrict the otherwise naked limitation, " in case Christina Lasseter should die without an heir of her body." And we hold, with the Court below and with the able and distinguished Counsel who have conducted this argument with such marked ability, that the words of this bequest do not mean an heir of Christina Lasseter, living at the time of her death ; but a general and indefinite failure of such heirs, whenever it shall happen,. sooner or later, without reference to any particular time or any particular event. And our judgment therefore is, that such attempted disposition of property, inasmuch as it would tie it up for generations and lead to a perpetuity—vests the absolute fee. in Christina Lasseter, the first taker.

It may readily be conceded, that testators do not intend deliberately to dispose of their property, contrary to law. They would be stultified by such a supposition. And yet, they very often do mean to give their estates to their children and their posterity after them, if they have any ; and that without having any very definite period fixed in their mind, as to the time when the event may happen ; still, they do not intend it shall go over to collaterals or remainder-men, who are more remote, until the posterity of the first taker has become extinct. In other words, so far as they have any meaning in their minds about the matter, testators do look to a general and indefinite failure of issue. This feeling is founded on the dictates of the heart ; and hence, they use language expressive of their desire in this respect.