Gray and another *vs.* Gray *et al.*

No. 154.—JOHN GRAY and another, plaintiffs in error, *vs.* SARAH GRAY and others, defendants.

[1.] It was the early policy of this State to abolish the English Law of entails and descents, so far as it tended to preserve, undivided, landed estates in families.

[2.] In this State, bequests of personal property expressed in such terms as would have passed an estate-tail by the Statute *de donis conditionalibus*, will vest in the persons to whom they are made, an absolute, unconditional, *fee-simple* estate.

[3.] The construction of that Statute (*de donis*) must be determined by the decision of the English Courts.

[4.] The words of the will in this case, if it had been a devise of real estate, would, according to the interpretation of the Statute *de donis*, by the English Courts, have created an estate-tail; and therefore, vests an absolute estate in the first takers.

[5.] A testator gave certain slaves to two of his daughters, Jane and Sarah, and then said: " And should Jane and Sarah, or either of them, die without an heir begotten of their bodies, then their part or parts to be equally divided between Polly Morrison, my said sons and the survivor": *Held,* that the limitation over was void.—BENNING, J.

In Equity, in Elbert Superior Court. Decision on demurrer, by Judge THOMAS.

The facts of the case are fully set forth in the opinions.

T. W. THOMAS; T. R. R. COBB, for plaintiffs.

HESTER & AKERMAN; TOOMBS, for defendants.

The Court not being unanimous, delivered their opinions *seriatim.*

McDONALD, J.

On the 1st day of January, 1819, Joseph Gray made and published his last will and testament. He died in 1822. By the third item of his will, he gave and bequeathed to his

two daughters, Jane and Sarah Gray, two negroes, girls, by the name of Mary and Dealer, to be equally divided between them. By the fifth item of the will, he disposed of the residue of his property equally, between his sons and two daughters, with the exception that John Gray was to have no part of the stock or house furniture, " and the said Jane and Sarah no part of the negroes, except those specially willed to them; and should Jane and Sarah, or either of them, die without an heir begotten of their bodies, then their parts to be equally divided between Polly Morrison, his said sons and the survivor." John Gray and Joseph Gray, two of the brothers, file this bill to obtain a writ of *ne exeat* or other process to prevent the removal of the negroes from the State, alleging that neither Jane nor Sarah has a child; that Jane is eighty years old, and Sarah is seventy-seven, and will never have one; that John Gray has purchased the interest of Polly Morrison in the remainder in said slaves and their increase, as set forth in the bill; that the other sons of the testator are dead, without issue; that the negro girl, Mary, died without increase or issue; that Dealer had increase, and sets forth the number and value; that one of the negroes has been sold and carried out of the State for the purpose of defeating the rights of complainants, as remainder-men, and they fear the rest will be carried off also. The complainants claim a remainder in all the slaves.

The defendants filed a general demurrer for want of equity to the bill. The Court sustained the demurrer and dismissed the bill, and on exceptions to the judgment on the demurrer, the cause comes to this Court.

The Counsel for the plaintiffs in error insist that the limitations over in the fifth clause of the will is good; the defendant in error maintains the contrary, and this forms the issue between the parties.

On the question made in this case, many decisions have been pronounced by this Court; but upon facts more or less varied, but so nearly like these presented here, that the able Counsel engaged on opposite sides, claim all the benefit that

would accrue from a strict adherence by the Court to the maxim "*stare decisis*." Satisfied that there is no case precisely like it, we shall not go into an investigation of them.

[1.] I shall proceed to an examination of the principles and rules of construction which must govern this case, and then proceed to apply them to the case made in the record.

This State was a colony of Great Britain, and certain of the laws of England were of force here; the rights of property depended, in a great measure, for their support on those laws; the people were accustomed to them; the Provincial Legislative Assembly had limits to its power which it could not transcend; it could not constitute, ordain or make any law contrary or repugnant to the laws and statutes of England; and such of the laws of that kingdom as had their origin in the obvious policy of that people to preserve, undivided, large landed estates in families, were beyond the reach of provincial power. Amongst the Acts of the English Parliament which could not be affected by colonial legislation, was the Statute establishing estates-tail. The last Revival Act of Georgia, passed in 1784, declared that all Acts, clauses and parts of Acts which were in force and binding on the 14th of May, 1776, so far as they are not contrary to the Constitution, laws and form of government established in this State, should be in full force, virtue and effect. The Common, and such of the Statute Laws of England as had been usually in force, with the same exception, were declared to be in force. The object of this Act was, to adopt laws suited to the circumstances of the people.

The popular and legislative will was enunciated no less distinctly, however, in respect to laws not suited to the condition of the people, and not in harmony with the new government, which had its foundation in the acknowledged equality of popular rights. To secure and maintain this equality of rights, it was essential that equality of condition should be promoted, as far as it was right that the laws of society should provide for it. Hence, in the first expression of popular will, after the people had assumed the prerogative of acting for

themselves, we find it declared that estates should not be entailed, and that intestates' estates should be divided equally among their children, the widow to have a child's share or her dower, at her option.   All other intestate's estates (such as left no wife and children) were to be divided by the Act of Distribution of *Charles II.* unless otherwise directed by the Legislature.   (*Constitution of 5 February*, 1777, *section or clause* 51.)   The Constitution of 1789 contains the identical provision against the entailment of estates.   The Statute of *Charles II.* had no application to real estate, and lands in Georgia continued to descend according to the unchanged English Law.   The Constitution of 1789 declared that intestate's estates, when there were no wife and children, or no children, should be distributed as might be regulated by law.   The Legislature, at its first session thereafter, in December, 1789, abrogated the English law of descent, in regard to lands, by enacting that "when any person holding real and personal estate shall depart this life intestate and without will, the said estate, real and personal, shall be considered altogether of the same nature and on the same footing," and prescribes the rule of distribution.   (*Mar. & Craw.* 217.)   By these constitutional and legislative provisions, the power of entailing estates, and the English law of descents, became extinct in Georgia, and so remain.

The Constitution of 1798 contains no prohibition against the entailment of estates.   The Act of 16th February, 1799, however, declares that estates shall not be entailed.   The provisions of the Act of 1789, placing real and personal estate on the same footing as to distribution, were re-enacted in 1821.   (*Cobb*, 293.)

[2.] Up to the year 1821, there was no legislative declaration of the effect of conveyances in fee-tail.   The Legislature had contented itself with prohibiting them, and left the consequences of the violation of the Act to be settled by the Courts.   A diversity of adjudications on this subject by the Courts, led to the establishment of a rule by the Legislature. The preamble to the Act of 1821, (*Cobb*, 169,) which estab-

lishes the rule, shows that three different constructions had
been placed upon the prohibitory Act, or upon conveyances.
prohibited by it:

1st. That conveyances in fee-tail were absolutely void.

2d. That they vest a fee-simple estate in the person to
whom they are executed.

3d. That they vest only a fee conditional, as at Common
Law.

The effect of the first construction was, that no estate
passed from the grantor; of the second, that the limitation
over in tail was cut off; of the third, that no absolute estate
vested until the performance of the condition, as having an
heir of the body. The object of the Legislature was, to pre-
scribe a rule of construction, plain, certain and intelligible,
which would prevent conflicts of judicial decision in regard
to the rights of property. By the Act, "all gifts, grants,.
bequests, devises and conveyances, of every kind whatsoever,
whether *real or personal property*, made in this State, and
executed in such manner, or expressed in such terms, as that
the same would have passed an estate tail in real property,
by the *Statute of Westminster Second*, commonly called the
*Statute de Donis Conditionalibus*, are to be held and con-
strued to vest in the person or persons to whom the same may
be made or executed, an absolute, unconditional fee-simple
estate. Here it is seen that the Legislature discarded the
first and third constructions and adopted the second; so that,
since the enactment of that Statute, the Courts are not at
liberty to say that such conveyances are void and pass no.
estate from the grantor; nor are they permitted to hold that
they pass a fee conditional at Common Law, to vest abso-
lutely or not, as the condition may be performed, but that
they do pass the estate, subject to no condition, to the person
to whom it is made or executed; an absolute fee, not accord-
ing to the intention of the testator, but to the exclusion of
those in remainder, in whom and whose issue, as long as there
are any, his purpose was to fix an inalienable property.

When a conveyance, *whether of real or personal property*,.

is presented to the Court for construction, the inquiry of the Court must therefore be, is the conveyance expressed in such terms as would pass an estate tail by the *Statute of Westminster Second?* The words " real property" may be rejected as surplusage, for they are super-errogatory, and were, no doubt, used by the Legislature for the purpose of being explicit and giving force to their enactment. It neither weakens nor vitiates it. The business of the Court is with the instrument which conveys the property, and it makes no difference whether it be a conveyance of real or personal property. Is it expressed in such terms as would have passed an estate tail by the Statute of *de donis conditionalibus?* If it would pass such an estate, the question is settled ; for it vests in the person to whom it is made or executed, an absolute, unconditional fee-simple estate. The legislative will is expressed in language too plain and unambiguous to be disregarded. The Court does not feel at liberty to say, against the positive command of this Statute, that there shall be one rule for construing a bequest of personal property, and another for construing a devise of real estate. The Legislature prescribed a rule for the construction of both. The caption of the Act is, to alter the rules for construing conveyances generally. The body of the Act expressly embraces " conveyances of every kind whatever, whether real or personal property." No " absurd consequences, manifestly contradictory to common reason," can arise out of the language employed by the Legislature to justify Judges, whatever opinion they may entertain of their power to do it, to declare that the Act shall have effect as to real estate, but not as to personal property. The words, the context, the subject matter, the effects and consequences, and the reason and spirit of the Statute, all conspire to demand of it the interpretation we place upon it, and to require its enforcement.

[3.] To ascertain whether the bequest, if it had been a devise of real estate, is executed in such manner, or expressed in such terms as that it would have passed an estate tail by

the Statute *de donis conditionalibus*, we must look to the interpretation of that Statute by the English Courts. We will first examine the bequest, and ascertain, if we can, the testator's intention. By the third item in his will he gave and bequeathed to his beloved daughters, Jane and Sarah Gray, two negro girls, Mary and Dealer, to be equally divided between them. By the fifth item of his will, he adds: should Jane and Sarah, or either of them, die without an heir begotten of their bodies, then their part or parts to be equally divided between Polly Morrison, my said sons, and the survivor. The intention of the testator was, to limit the entire property (the negroes and their increase) over, if Jane and Sarah died without heirs of their body, and not otherwise. The difficulty as to his purpose, arises from the testator's jumbling the two together in one sentence. It is manifest, however, as above stated, that he intended to dispose of the entire property, on the failure of an heir to be begotten of their bodies; and to express his intention, the bequest may be varied thus: should either Jane or Sarah die without an heir begotten of her body, then her part to be equally divided between Polly Morrison, my sons and the survivor; and should the other die also, without an heir begotten of her body, then her part to be equally divided between Polly Morrison, my said sons and the survivor. This reading expresses the intention of the testator, because he uses the singular and plural both, to show that he intended to give the same ultimate destination to the property, on the death of the last. If *Jane and Sarah, or either of them,* die—if they die without an heir begotten of *their bodies*—then *their part* or *parts,* &c. If, as urged in the argument, the testator did not intend that the property of the surviving sister should be limited over, and that the survivor of the two should take an absolute property, the testator would simply have said, that on the death of either of my daughters, without an heir of her body begotten, the other surviving her, then her part to be equally divided, &c. Nothing would have been said in reference to the death of both, or the parts of both. But the

Gray and another *vs.* Gray *et al.*

complainants' Counsel took the other view of the case, and considered that the limitation over embraced both daughters and their property; for they claim, as remainder-men, their entire property, and ask security for the whole. But it matters not which construction of the bequest prevails; for under the rule we have laid down, the word "survivor" cannot vary the case, in whatever connection it may be used. That we will show directly.

The expression, "dying without an heir of the body begotten," is equivalent to the expression, "dying without issue." It is admitted by Counsel for plaintiffs in error, that the words, "dying without issue," uncontrolled by other words, mean an indefinite failure of issue, whether applied to realty or personalty; and that the first taker takes an estate tail by implication. But he argues that the words in this will do not create an estate tail by the Statute *de donis conditionalibus*, the *words* of the Statute applying to express gifts, only to one, and his heirs begotten, &c. There are no estates tail but by that statute; and all estates tail, whether express or by implication, are by virtue of that Act. If the portions of the will we are considering would pass an estate tail, whether express or by implication, an absolute, unconditional fee-simple title vests in the daughters, Jane and Sarah. It is conceded, then, that if this had been a devise of real estate to Jane and Sarah, and the heirs begotten of their bodies, an estate tail would have been created. But in this clause there is no estate given to the heirs of the body of Sarah and Jane, but the property is given over if they die without an heir begotten of their body. It is clear that Polly Morrison and the sons can take no remainder, if there are heirs of the body, or as long as there are heirs of the body. It was the intention of the testator that the heirs of the body should take, if there were any, although there was no express gift to them. To effectuate the intention of the testator, then, Sarah and Jane must take an estate tail transmissible through them to their issue. *Knight vs. Ellis*, (3 *Bro. C. C.* 275.) This is the rule in England in regard to real estate. If, on

the hypothesis of the plaintiff in error, they take such an estate, it is void, and the gift in fee stands.

We will now consider the effect of the use of the word " *survivor*," in either of the relations mentioned.

[4.] There can be no question of the testator's intention that the limitation over should not take effect, if there were heirs of the body of the daughters. In the case of *Webb vs. Hearing*, (2 *Croke's Rep.* 415,) there were other words besides the term " survivor," to indicate the testator's intention, that the limitation might take effect in the lifetime of the survivor. The words of the will were : " I bequeath to Francis, my son, my houses in London, after the death of my wife; and if my three daughters, or either of them, do overlive their mother, Francis, their brother, and his heirs, then they to enjoy the same houses for the term of their lives," then a limitation over.

It was held that the son had a fee-tail. In that case, the remainder-men never could have taken, if the son had had children; for the Court held that the word "heirs," meant heirs of the body. So in this case, if Jane and Sarah had children, the remainder-men could not take, and so the complainants think; for they say in their bill that they have both passed the age of child-bearing. In the case of *Webb vs. Hearing*, the son, Francis, having died without heirs, in the lifetime of the sisters, the limitation not being void, in England, as against law, took effect. In this case, the limitation over being void by Statute, the fee, as first given to Sarah and Jane, vests and remains in them. In another case of a will, (*same vol.* 448, *King vs. Rumball,*) the testator devised the whole of his houses and free lands for her life, and after her death to his three daughters, equally to be divided ; and if any of them die before the other, then the others to be her heirs, equally to be divided; and if they all die without issue, then to three others named in the will, &c. The whole Court adjudged that the daughters took vested estates tail. In the case of *Chadoch vs. Cowley—* same authority, 695—the testator devised lands to his wife

for life; and after her death, one parcel to his son Thomas and his heirs forever, and another parcel to his son Francis and his heirs forever.    The will then proceeds—"*Item.* I will that the survivor of them shall be heir to the other, if either of them die without issue."    The question was, whether the devise was an estate tail immediately by the devise, or only a contingent estate, one of the brothers having died without issue in the life of the brother, and it was held to be an estate tail.    It was objected, that one of the brothers dying without issue, the other was his heir, and that the will gave him no more than he would have taken by the law; but as it did not appear but that he had other children, and by the devise he intended to give it to the others by way of devise, if he died without issue, it was held to be an estate-tail.    So, in the case under consideration, it does not appear but there were other children, or descendants of children, and the bequest excluded some who would have been heirs at law.    It is unnecessary to refer to the multitude of more modern cases in respect to the effect of the word "survivor," on the devise over.

I will refer to one or two American cases to show that the word "survivor," in a will of land, does not prove that the limitation was to take effect within the lifetime of the survivor.    The words of the will, in the case of *Bells vs. Gillespie*, (5 *Randolph,* 275,) were: "I give and bequeath to my son Pleasant the land which I lent to my wife, before mentioned, containing one hundred and fifty acres, to him and his heirs, after the decease of my widow, or sooner if she marries, as before provided; and further, my will is, that if either of my said sons, to whom I have bequeathed lands, should die without lawful issue, that the part allotted them be equally divided among the surviving brothers, children of my last wife."    This was held to be a fee-tail.    The case of *Broaddus vs. Turner*, in the same authority, 310, is, if possible, a stronger case.    The words of the will in that case are: "The above-mentioned lands I give to my above-named sons, to them and their heirs forever.    But if either of my said sons

should die without issue, lawfully begotten, then it is my desire the survivor should have the whole. But if both of my sons should die without lawful issue, then it is my desire my said land be sold by my executors to the highest bidder, and the money arising therefrom be divided among my daughters then living; and if, in case any of them should be dead and leave children, then in that case, it is my desire that the children of the deceased shall have an equal share with those living; so that each child or their children shall have an equal part." The Court held that this will created an estate tail in the sons. The opinion of Chancellor *Kent*, in the case of *Anderson vs. Jackson*, certainly states the law of such a case, and reviews the authorities applicable thereto as fully and ably as they can be found embodied in the same space anywhere. He shows that a limitation over in every analogous case is void. It is true, that that was a devise of lands, and this is a will of personalty; but I have shown that, in this State, the terms which would create an estate tail in realty, destroys the limitation over of personalty; that the term "survivor" used in a will of personalty, can receive no other construction than if used in a will of realty in England; that there can be no two variant rules of construction here—one for construing wills of lands, and another for construing wills of personalty; and that the one for the construction of conveyances of lands, is the rule that governs all here. It would seem that all that remains for us to say is, that we affirm the judgment of the Court below—as, by the application of the above rules to this will, the limitation over of the negroes after the death of Sarah and Jane, without an heir of their body begotten, is void; and under our Statute, they take a fee in the property.

But I will add but a few remarks in respect to decisions which have heretofore been made touching the same question. In examining them as far as they have been accessible to me, they have been made upon authorities found in the English books, which certainly lay down two distinct rules for construing the same instrument—giving more indulgence to

testamentary dispositions of personalty than of realty. There may be good reasons for it there; but if they were considered equally good here, the Judges could not allow them to operate without a repeal of the Act of 1821, on which I have already remarked. The rule laid down by that Statute is a wise one. It furnishes a certain rule, and one by which testamentary dispositions of property can be easily and readily tested. An object of our law, in addition to that which I have already mentioned, of preventing the accumulation of large estates in few hands, is to unfetter property and to settle at once the title, and not to allow it to be incumbered by contingencies which it might take years to settle. Our policy is to open property of all sorts to trade, and to permit as few obstacles to be thrown in the way of the fair purchaser as possible. It is wise and just. Our laws sustain that policy. In England, chattels cannot be entailed, nor can a fee conditional be created in them. (2 *Bl. Com.* 113, *n.* 17.) An annuity granted out of personal property, is an exception. "There may be a fee conditional in an annuity, but it cannot be entailed; and there can be no remainder in it, because there can be no remainder of property which is not within the Statute *de donis*." *Turner vs. Turner*, (1 *Bro. C. C.* 325.) Grant that there might be a fee conditional in the negroes given to Jane and Mary, the consequence would be, that on the performance of the condition, the fee would become absolute in *them*. But if the condition be not performed, as there can be no limitation over in such case, the remainder is void. But as this case has been decided on another view of it, it is unnecessary to pursue this farther. We have not referred to judicial constructions of the Act of 1821 by our Courts, because they do not seem to have looked to it in cases where it would seem to us to apply; but it is difficult to put the decision of the case of *Hollifield vs. Stell*, on any English rule of construction in respect to personal chattels. The earliest reported case I have seen involving facts to which the Statute of 1821 would apply, is the case of *Atwell's Ex'rs vs. Barney*. The Act is not re-

ferred to in that case. The Act is so important an one, that it seems to have been an oversight that is unaccountable; for it is impossible to conceive and as unjust to presume, that the Courts would have passed over, intentionally, an Act of the Legislature of so much importance and so clearly constitutional. But if it has been passed over, and the Courts have disregarded the rules there laid down, what is this Court to do? Is it to fall in, and acquiescing in this disregard of the legislative authority, to treat the Act as a nullity, and expound conveyances of property by the old rule? I do not feel myself at liberty to do it. I consider a legislative Act which violates no provision of the Constitution, State or Federal, of the highest authority. It overrides older Statutes, the Common Law and judicial decisions, which are repugnant to and come in conflict with it. I repeat, that I will not suppose that any Judge or Court has purposely disregarded the Act of 1821. They either did not direct their attention to it or have interpreted it differently from myself. I have seen it barely adverted to in one case, and in no case have I seen an analysis of its provisions.

———

BENNING, J. concurring.

Are the words of this will such, that if the property they relate to was real property, they would, by the Statute *de donis*, assuming that Statute to be in force, have the effect to create estates-tail in the testator's daughters, Jane and Sarah?

If they are such, they create estates-tail in those daughters, although the property to which they relate is personal property. For the Act of 1821, concerning entails, and the con-

struction of conveyances, declares "That all gifts, grants, bequests, devises and conveyances of every kind whatsoever, whether of real or personal property, made in this State, and executed in such manner, or expressed in such terms as that the same would have passed an estate tail in real property by the Statute of *Westminster Second* (commonly called the Statute *de donis conditionalibus*,) be held and construed to vest in the person or persons to whom the same may be made or executed, an absolute, unconditional, *fee-simple* estate."

It is not disputed, that the words are such that they would have the effect aforesaid, unless prevented by the counter effect of one of them, the word "*survivor*": provided the Statute *de donis* is the source of estates tail in cases in which, for example, the gift, though not in so many words, to one "and the heirs of his body issuing" is, yet, in such words that it must be implied from them that the giver intended the gift for one, "and the heirs of his body issuing": provided, to express the idea in more common language, the Statute *de donis* is the source of estates tail by implication.

Is that Statute, then, the source of such estates tail? It is. (2 *Ins.* 334 ; 1 *Cruise Dig.* 72 ; 2 *Crabb Real Prop.* §975.)

All estates tail derive their origin from that Statute. "An *estate tail* may be *described* to be an estate of inheritance deriving its existence from the Statute *de donis conditionalibus*, which is descendible to some particular heirs only of the person to whom it is granted, and not to his heirs general." (1 *Cruise Dig.* 70.)

The pith of the Statute is contained in these words: "*propter quod dom rex,*" "*statuit quod voluntas donatoris, secundum formam in charta doni sui manifeste expressum, de caetero observetur.*"

"Wherefore our Lord, the King" "hath ordained that the will of the giver, according to the form in the deed of gift manifestly expressed, shall be from henceforth observed." (2 *Ins.* 332.)

If the will of the giver be, that his gift shall go to A and the heirs of his body, and he in any way manifestly expresses that will, these words require that the gift shall go to A and the heirs of his body. These words do not say that the giver must use the words, " to A and the heirs of his body," and no others. Any words equivalent to these will as manifestly. *express* the import of these, as these will.

The Statute *de donis*, then, is the source of even estates tail, by implication.

Does the word "*survivor*" have such a counter effect to that of the other words, as to prevent those words from creating estates tail in the daughters, Jane and Sarah ?

The words of the gift, it is to be remembered, are to be construed as if the property to which they relate was *real* property.

Now there is no British case, as I think, that gives such a counter effect to the word "survivor"; and there are at least two British cases that say that the word cannot have such a counter effect. These are *Chadock vs. Cowley*, (*Cro. Jac.*. 695,) and *Roe vs. Scott & Smart*, (*Fearne, C. R.* 473–'4 *n.*) In the first of these cases " there was a devise of Blackacre and Whiteacre to M for life; and after her death, Blackacre to B and his heirs forever, and Whiteacre to C and his heirs forever; and if either of them should die without issue, the survivor should be heir to the other; and it was held that each of the devisees in remainder took an estate tail with a vested remainder to the other, and that it was not a contingent limitation to the survivor on the death of either, without issue in the lifetime of the other." I quote from *Lewis on Perpetuities*, 219.

The same author remarks, that " The doctrine in question," viz : that the word survivor will control the words of entail, " does, indeed, so far as respects *personal* estate, seem to possess stronger claim to reception as a rule of law, as we shall see hereafter ; but all the authorities bearing upon it are strictly *confined* to limitations of personalty. However, this fact cannot be deemed *conclusive* against its applicability to

limitations of real estate; because, in none of the cases has any such supposed distinction been noticed or referred to; but upon two or three occasions the question has been argued, both on the one side and on the other, without reference to the nature of the subject-matter of the limitations." (*Id.* 221.)

There is an Irish case in support of this doctrine, *Fisher vs. Barry*, (2 *Hog.* 153,) cited in the same work, 218.

And there were read, on the argument, several "American" cases in favor of the doctrine.

But British cases must, in general, far outweigh American or Irish cases, on a question of Georgia law. The law that Georgia adopted was British law; and British law of the era of the first settlement of Georgia, or, perhaps, rather, of the era of the surrender of the charter by the trustees to the King.

And it was not until about the time of the former era, that British Courts felt themselves at liberty to say that in a gift, including both realty and personalty, a word occupying precisely the same relation to both, might be considered as evidence of an intention in the donor that the donee should take in the personalty, after a definite failure of issue, in the realty after an indefinite failure of issue. *Forth vs. Chapman*, (1 *P. Wms.* 667,) decided in 1724, was the first case, I believe, in which any Court ventured upon this course.

But say that this doctrine is true—say that this word, "survivor," may have the effect to control words of entail, yet, it must at least be admitted that the word can have this effect only in cases in which there is nothing to counteract its having this effect.

Now in this case, there is something to counteract the words having this effect.

[1.] The gift over is to Polly Morrison, a daughter of the giver, to the sons of the giver, and to the survivor of Jane and Sarah, daughters of the giver, if either should die without an heir begotten of her body.

Now as to all of these donees, except the last named one,

there is nothing whatever in the terms of the gift to control the words of entail. The word "*survivor*" does not apply to those donees. And the fact that they were persons in existence at the time when the gift was made, is not such a fact as could at all affect the words of entail.

This was decided in *Hollifield vs. Stell*, (17 *Ga. R.* 280.)

As to the whole number of the donees, then, except one, and the number was quite large, the intention of the donor was, that they should take only on the termination of estates tail in the first takers.

But he must have intended that one to take at this same time too, for he directed the property to be equally divided among all of the donees ; and a division of the property was a thing that could not take place among all of the donees, unless at the time of the division each was entitled to his share. Besides, all the donees were his children. And there appears no reason why he should have wished the shares of all his children, except one, to come to them at one time, and the shares of that one to come to him at another time.

As, therefore, the testator intended all of the donees to take at the same time, and as he intended, as to all of them but one, that that time should be, and not until the termination of an estate tail in the first taker, he must have intended as to that one, also, that the time should be, not until the termination of an estate tail in the first taker.

Such is the consequence of the influence over the word survivor, which the words in company with it have.

And it is proper that those words should influence it, rather than that it should influence them; for, of a large class of objects, all equally near to the donor, it represents but one, whilst they represent all the others.

[2.] To vary the idea a little—the words actually used by the testator must have had the same effect which equivalent words, if used by him, would have had. The words actually used by him were these: '' And should Jane and Sarah,'' (daughters of the testator,) '' or either of them die without an heir begotten of their bodies, then their part or parts to

be equally divided between Polly Morrison," (another daughter of testator,) "my said sons and the survivor." Now what would be equivalent words to these? The following, I think: " And should Jane and Sarah, or either of them, die without an heir begotten of their bodies, then their part or parts to be equally divided among *my other children*, including Jane, if the one so dying without such heir should be Sarah, and Sarah, if the one so dying without such heir should be Jane."

But the effect which these words would have had would have been, to create estates tails in the first takers, Jane and Sarah. So decides *Hollifield vs. Stell*, (17 *Ga. R.* 280.)

Indeed, I may say that I do not find it possible to distinguish this case from that. In that case, the remainder-men were a class composed of brothers and sisters all living at the time when the gift was made; in this, the remainder-men were, also, a class composed of brothers and sisters all living at the time when the gift was made. And as I am not prepared to over-rule the judgment in that case, I must vote for affirming the judgment in this.

----

LUMPKIN, J. dissenting.

I am compelled, very reluctantly, after a service of eleven years upon this bench, to dissent, *for the first time*, from the judgment of a majority of the Court. Of such paramount importance have I considered *unanimity* of opinion, with a view to *uniformity* and *permanence* in its decisions, the great end for which this tribunal was established, that I have not hesitated to sacrifice the pride of professional opinion, and a practice to which I had been accustomed for more than a quarter of a century, when it came in conflict with a more

general practice which had obtained in the State. I am sat-
isfied, that in construing statutes and establishing rules of
practice, it is not so material that they should be fixed *one*
way or *another*, as that they should be FIXED. And even
now I might have yielded my own convictions, strong as they
are, to those of my brethren, but for the magnitude of the
questions involved. I allude not to the amount of property
at stake, and not alone to the importance of the immediate
question discussed; for back of that, or rather underlying it,
there is a much graver matter; and that is, the establish-
ment of a principle which ignores the unbroken current of
adjudications in Georgia for thirty-four years, including sev-
eral solemn judgments of this Court. Extend the same prin-
ciple to every other vexed question of law which may be
brought before this Court, and you make its decisions as va-
rious and vascillating as may be the minds of the several in-
cumbents who, from time to time, may occupy seats upon
this bench. And thus, I repeat, will be defeated the first
great, fundamental object of the Legislature in creating this
Court; that is, the stability of the law.

The only point involved in this case is, whether the limita-
tion over to the brothers and sisters in the following item of
Joseph Gray's will is too remote. The words of the clause
are these: "And should Jane and Sarah, or either of them,
die without an heir begotten of their bodies, then their part
or parts to be equally divided between Polly Morrison, (a
daughter,) my said sons and the "survivor."

It is conceded that the word *survivor* applies to Jane and
Sarah. And Counsel for defendants in error contend that
this limitation is too remote, because the testamentary inten-
tion was, not that it should take effect at the death of Jane
or Sarah, but upon an indefinite failure of the issue of Jane
and Sarah. On the other hand, it is insisted in behalf of the
plaintiffs in error, that the testamentary intention necessarily
contemplates the limitation to take effect at the death, be-
cause the gift over is to the *survivor*. And if it was to take
effect *within* the lifetime of the *survivor*, it is impossible to

say that is too remote, because the law allows of limitations within a life or lives in being and twenty-one years, and the usual period of gestation afterwards.

Is not the bare statement of the question its decision? How can we impute an *indefinite* time to the testator as his intention, when he has limited it, himself, to the lifetime of the shortest lived of his two daughters?

When we come to examine the decisions of the Courts, we find that they have not been blind or deaf to the obvious intent of testators using the word *survivor*, or those of similar import; but giving to it its plain and natural meaning, have restrained by it the effect of other words which would otherwise indicate an indefinite failure of issue.   The English authorities are numerous; and as to personal property, uniform, except in those cases where, from the context, the Courts have construed the word *survivors* not to bear its ordinary, primary signification, but to be synonymous with *others*.   These latter cases are, however, the exceptions, not the rule.   (*Nichols vs. Skinner, Pre. in Ch.* 528; *Hughes vs. Sayer,* 1 *P. Wms.* 524; *(leading case;) Massey vs. Hudson,* 2 *Merivale,* 130; *Crowder vs. Stone,* 3 *Russ.* 217; *Ranelagh vs. Ranelagh,* 2 *Mylne & K.* 441; *Fearne on Remainders,* 472, 473, 481; *Smith on Executory Interests,* 280.)

I am aware that Mr. *Lewis,* in his *Work on Perpetuities,* has expressed some doubt as to the inflexibility of the rule on account of a loose expression of Sir *Wm. Grant* in one case, and because of Lord *Brougham's* anxiety, in another and later case, to place his decision upon a different ground than the recognition of this rule. (*Lewis on Perpetuities,* 343.) I need only remark, that this is too vague a foundation to cast doubts upon a well settled rule of law; and that to us, at least, Lord *Brougham's* doubts in 1832 should cast no shadow upon a doctrine so thoroughly established at the time of our Adopting Statute.

When we turn to the decisions of our sister States, to seek lights upon this question, we find there also a remarkable

unanimity. (*Fosdick vs. Corwell*, 1 *Johns.* 440.; *Moffat vs. Strong*, 10 *Johns.* 13; *Jackson vs. Staats*, 11 *Johns.* 338; *Anderson vs. Jackson*, 16 *Johns.* 382; *Lion vs. Bruless*, 20 *Johns.* 483; *Jackson vs. Christman*, 4 *Wend.* 277; *Cutter vs. Doughty*, 23 *Wend.* 513; *Richardson vs. Noyes*, 2 *Mass.* 56; *Combe vs. Gorham*, 1 *Conn.* 36; *Mifflen vs. Neal*, 6 *Serg. & Rawle*, 460; *Smith vs. Chapman*, 1 *Hen. & Munf.* 240; *Cordle's Adm'r vs. Cordle*, 6 *Munf.* 455; *Brooks vs. Croxton*, 2 *Gratton*, 586; *Zollicoffer vs. Zollicoffer*, 4 *Dev. & Bat.* 438; *Threadgill vs. Ingram*, 1 *Iredell's L. R.* 577; *Gregory vs. Beasley*, 1 *Iredell's Eq. R.* 25; *Whitehead vs. Potter*, 4 *Iredell*, 257; *Cordes vs. Adrian*, 1 *Hill's Ch. R.* 154; *Terry vs. Bronson*, 1 *Rich.* 78; *Lowry vs. Bryson*, 4 *Rich. Eq. R.* 262; *Williams vs. Graves' Ex'x*, 17 *Ala. R.* 62; *Powell vs. Glenn et al.* 21 *Ala.* 458; *Booker vs. Booker*, 5 *Humph.* 505.)

It is true that there is a distinction taken in some of the authorities between the word *survivor*, and the words *survivor and his heirs*. But as the latter words do not occur in this will, it is unnecessary for me to examine or pass upon the correctness of this distinction.

In *Anderson vs. Jackson*, (16 *Johns.* 382,) Chancellor *Kent* dissented from the judgment of the Court, (which affirmed his own previous decision,) and this dissenting opinion has been emphatically relied upon by the Counsel for defendants in error. It contains an elaborate review of the cases decided upon the words *dying without issue*, and similar words; and when the Chancellor has successfully shown that such words mean an indefinite failure of issue, his conclusion is, that the addition of the word *survivor* does not limit the time to the death of the first taker. Now the only cases referred to by the Chancellor where a clause of *survivorship* was inserted, are *Pells vs. Brown*, (*Cro. Jac.* 590;) and *Richardson vs. Noyes*, (2 *Mass.* 56.) *And both of these were adverse to his decision.* He says the latter was over-ruled in *Ide vs. Ide*, (5 *Mass.* 500,) which, strange to say, when examined will be found to be a naked case of *dying without is-*

Gray and another *vs.* Gray *et al.*

*sue,* with no reference whatever to the question of *survivorship!* Perhaps the change in the opinion of this distinguished Judge is to be found in a note to his *Commentaries,* (*Vol. IV. p.* 278,) where he says that this decision "shifted and disturbed real property in the City of New York to a distressing degree." Such influences may, unconsciously to themselves, warp the opinions of the greatest and best of men. Suffice it to say, however, that this dissenting opinion has never been regarded by, and but seldom alluded to, in the Courts of New York.

I have, in the outset, intimated that this question is not new in this State. Before the organization of this Court, the Circuit Judge, at least of one district, had maintained the same doctrine. *Mayor vs. Wiltberger,* (*Ga. Dec. pt. II. p.* 20.) In *Benton vs. Patterson,* (8 *Ga. R.* 146,) this Court recognized this to be the law. And for myself, I then announced "that whatever technical words are used in the instrument, whenever the devise over is to a person or persons in life as *survivor,* they ought to be interpreted to import a failure of issue at the time of the death of the first devisee, and they do not mean a general or indefinite failure of issue." (*p.* 151.) The authorities read and the masterly argument submitted on both sides of this case, are unsurpassed for power and learning since the establishment of this Court, have confirmed rather than shaken my confidence in the opinion then expressed.

It has been suggested, that even if the word *survivor* would restrain the limitation over to the death of the first, Jane or Sarah, who should die, it could not have that effect at the death of the last, as there would be then no *survivor.* But I would respectfully reply, that Counsel seem to lose sight of the question we are investigating. The point is as to the *testamentary intention.* Did Joseph Gray mean an indefinite failure of issue, or a failure at the death of his daughters? Grant that the latter was his testamentary mind, and it matters not who takes—and there is no necessity of an *ac-*

*tual survivorship* to make the limitation good. Besides, if the latter limitation was not good, the former being good, the Court erred in sustaining the demurrer.

The able and eminent Counsel who represent the defendants in error, do not deny the weight of English and American authority in cases relating to personalty. But they do reject their application and conclusiveness to cases arising in Georgia. The argument is this: That under the Act of 1821, all questions as to both realty and personalty are to be governed and controlled by the English decisions, as to *realty* alone. That the modifications of the English rule, as to realty, which the English and American Courts have introduced as to personalty, were wholly inadmissible in this State, the Act of 1821 subjecting every case to the Procrustian bed of the stern rule relating to realty; that it was an old and hoary error of the Judge's transmitted from age to age, to say that this iron rule had been adopted in England in favor of the heir; but that on the contrary, it was an effort on the part of the English Courts to untie the limitation of estates, and to convert executory interests into estates tail, in order to dock the entail by the fiction of fine and recovery. To use Counsel's own illustration, it was said that the Courts sought to create entails for the purpose of destroying them—just as the South Sea Islanders demanded more missionaries in order to eat them. That to apply this rule to this case, the word *survivor*, would not be held in England to restrain the limitation when applied to realty, the tenor of decisions fixing the rule the other way; and hence, in Georgia, it could not have that effect, under the Act of 1821, when applied to personalty. Such I understand to be the position maintained. I propose to examine its soundness.

The accusation brought against Judges and Courts, of ignorance, as to the reason for adopting this rule, is a grave one; and if tenable, should be proven, so as to be avoided in future. Let us look to its history.

Gray and another *vs.* Gray *et al.*

Estates tail are the creatures of the Statute of *Westminster 2d,* commonly called the Statute *de donis conditionalibus,* passed 13 *Ed. I.* Prior to that Act, the Judges had held such estates to be *upon condition;* and in order to shorten their duration, had decided, that so soon as there was issue *or heirs of the body,* the condition was performed, and the first taker took an absolute fee. The nobility were dissatisfied, wishing by some means to perpetuate the estates in their families. Hence the Statute. It recites certain cases, and complains that the donors had been theretofore " barred of their reversion, which was directly repugnant to the form of their gifts"; and ordains " That the will of the giver, *according to the form in the deed of gift manifestly expressed,* shall be henceforth observed; so that they to whom the land was given under such condition, shall have no power to alien the land so given, but it shall remain unto the issue of them to whom it was given after death, or shall revert to the grantor if issue fail," &c. (2 *Cary's Ab.* 722 ; 1 *Ruff. Stat. at large,* 78.) It will be perceived that this Statute applies only to *express entails* created by the words of the instrument, and to carry out the intention " *as manifestly expressed.*" How then arose estates tail by implication?

There was another rule of the Courts adopted for the same purpose as that in reference to conditional estates, (viz: to shorten the duration of limitations of estates,) which was, that all attempts to create a perpetuity were void; and in such cases, the Courts held that the first taker took an absolute estate. After some vacillation, the rule was fixed, that any limitation which was not to take effect within a life or lives in being, and twenty-one years and the usual period of gestation thereafter, was within the rule against perpetuities and void. Shortly after the passage of the Stat. *de donis,* cases of this sort arose: gifts were made to A for life, and upon the failure of issue or heirs of his body, then over.

The intention, as the Courts perceived, was here manifestly so long as A had an heir of his body—such heir it was evidently the wish of the testator should take; and on failure

of such issue, the limitation over. But this limitation was void, as being within the rule against perpetuities. The rigid effect of the rule was, to give A an absolute fee. But that was not the testator's intention, because he gives to A for life only. Let us mark—there is no gift whatever to the issue or heirs of the body. Now in this dilemma, the Courts invoked another rule of law; and that was, that where there is a clear, general intention, and there is also a particular intent, if the latter fail, then the Courts, by the doctrine of *Cyprês* or approximation, will carry out the general intent, and in a mode as near the particular intent specified as possible. Here, there was a general intention that A should enjoy for life; and that after his death, the heirs of his body should enjoy, so long as there were such; and on failure of such, some other person. The latter part being contrary to a rule of law, the Court carries out the balance of the intention by implying an estate tail in A, instead of an estate for life, and thus gives A the enjoyment of the estate for life; and at his death, gives the same to the heirs of his body. Thus arose estates tail by implication.

What was the object, and what the effect? The object was manifestly to give to the heirs of A that benefit which was intended for them, and not permit the rule against perpetuities to give to A an absolute estate, with power of alienation to the exclusion of his heirs. Was not this, then, in favor of the heir? The effects were—1st. To deprive A of the power of alienation, so as to exclude the heirs. 2d. To deprive him of the power of charging the estate with bond debts while living, or with payment of legacies after his death. 3d. To deprive him of the power of devising to the exclusion of the heir. Were not all these effects in favor of the heir?

But Counsel contend that it did not have the effect of depriving A of the power of alienation; because, by the simple process of fine and recovery, this object could be accomplished. But estates tail had been implied by the English Courts for two hundred years before the fiction of fine and recovery was adopted by the Courts. (2 *Black. Com.* 117.) It is not

Gray and another *vs.* Gray *et al.*

legitimate, therefore, to say that the Courts favored these estates, and implied them in order to destroy them, as no such motive or reason could have existed at the time of their origin.

When it is said that the Courts and nobility of England have, at sundry periods during the history of that country, been at issue as to the policy and propriety of tying up estates so as to prevent alienation, the statement is sustained by the truth of history.  At the same time it is equally true, that where the intention of testators was to secure to the heir of the first taker the estate and prevent the latter from defeating this intention, the Courts of England have been diligent to effectuate this intention, so far as it was legal.  Estates tail being legal, they have favored them where they would secure this object, as we should favor them were they legal in Georgia, and carried out the intention of testators. At the same time, it is conceded that remote executory interests in land are not favored, because they tie up estates. But it must be admitted, that entailment of estates (especially since by fine and recovery the entail can be docked) are favored both by the Courts and legislation of Great Britan.

I am constrained, therefore, to withhold my assent from the criticism and strictures of Counsel, as it respects this "hoary error of Judges and Courts."

But to the argument: Does the Act of 1821 (*New Digest,* 169,) prescribe any such rigid rule as that contended for? Are we constrained thereby, not only to disregard the manifest intention of testators in cases of realty in obedience to the English decisions, but are we forced to go far back of the intelligence and equity of the English Courts and apply to bequests of personalty a rule never before prescribed by the Courts in England or America?  Are we compelled, by this Act, to impute to testators an intention which their very words declare to be false, and refuse to carry out an intention plainly expressed, because of some English policy connected with their landed interests unknown to and uncared for by by the testator?  I should hesitate long before I could be-

lieve that the clearest language could manifest such an intention on the part of our Legislature.

The Act of 1821 evidently does not.   If there be any authority in the decisions of this Court, (and if there be not, let it be abolished—the sooner the better,) this question has long since been settled.   In the case of *Roberts and Wife vs. West*, (15 *Ga. Rep.* 123,) one of my brethren now, as Counsel then, urged upon our consideration this construction of the Act of 1821.   The Court were *unanimous* in over-ruling it.   In other cases since that, especially in *Harris, adm'r, vs. Smith, ex'r*, (16 *Ga. Rep.* 545,) it was again argued before us, and again *unanimously* over-ruled.   In writing out the opinion in that case, my late most highly esteemed colleague, Judge STARNES, argues this question ably and elaborately.   In *Hollifield vs. Stell*, (17 *Ga. Rep.* 280,) the point decided was, that a mere limitation over to persons *in being*, did not save the case from the rule against perpetuities; (against which ruling there is more authority than I was aware of at the time it was made;) yet, this topic was discussed, and the previous position occupied by this Court as to the proper construction of the Act of 1821 reviewed and re-affirmed.

But more than this: every decision in our Courts for thirty-five years upon similar questions have been wrong. The cotemporaneous exposition of the Statute by the Judges in convention in *Atwell's Executors vs. Barney*, (*Dudley*, 207,) was wrong.   The decisions of this Court upon these doctrines for eleven years, and running through twenty volumes, are all wrong.   The rights of property which have been established by this uniform current of decisions, are all to be disturbed and put in jeopardy.   Titles considered good under the law, are to be rendered worthless.   And all this to be effected by imputing to the Legislature an intention which they, nor the bar, nor the bench ever discovered, until the generation which enacted and expounded the law have passed away.

It does seem to me that sitting, as we do, as the Dernier Forum in the State, we should pause before consenting to lay

Gray and another *vs.* Gray *et al.*

such heavy hands upon the adjudications of all of our Courts and the rights of property of our fellow-citizens. I may be too conservative upon the doctrine of *stare decisis.* Old Judges, old laws, is an ancient proverb, and perhaps with some, a standing stigma in jurisprudence. But my firm persuasion is, that until precedents are abolished altogether, and every case shall be tried upon its own merits, according to the broadest principles of equity, "bad decisions are better than no decisions; and that variable judgments are worse than none, for they leave men in increased doubt as to their relative or respective rights." Counsel are at a loss how to advise clients, and the citizen is at sea in making his contracts. And what is more deplorable still, when he sits down to declare what disposition shall be made of his property after his death, he finds the law in a state of confusion upon this subject, from which nothing but a miracle can redeem his estate so as to effectuate his intention.

And to render such a revolution in our laws most inopportune at this time, in 1854 our Legislature (*Pamphlet Acts, p.* 72) swept away all this legal learning and technicality, by declaring that thereafter all limitations of property, either real or personal, so as to vest in another upon the first taker dying without issue or heirs, &c. shall be held to mean a definite failure of issue. This Act is in harmony with the spirit of all the past adjudications of the Courts; and is, of itself, the best answer to the argument of Counsel against allowing a reasonable limitation of property. Whenever this privilege shall be abused, it will be time enough to meet the evil by legislation.

I could content myself with resting here the grounds of my dissent to the judgment of the Court; but I prefer to add a few words to the reasons I assigned in *Hollifield vs. Stell* for my disagreement to the interpretation, now for the first time put upon the Act of 1821.

When we come to a literal construction of the Act, (and it is upon this that the argument on the other side is based,) we find that it extends only to gifts, &c. "*expressed in such*

*terms as that the same would have passed an estate tail in real property by the Statute of Westminster* 2d." Now the Statute of *Westminster* 2d, as I have already shown, has nothing to do with "remote limitations" and "estates tail by implication." Literally, there are only three cases where the gift could be "*expressed in such terms* as that the same would have passed an estate tail in real property, by the Statute of *Westminster* 2d." That is the three cases mentioned in that Statute: 1st. A gift to a man and his wife, and to the heirs begotten of their bodies. 2d. A gift in frankmarriage. 3d. A gift to another and the heirs of his body issuing. It cannot be pretended, therefore, that any of the cases of remote limitations or implied estates tail come within the language of the Statute *de donis*. But, says the Counsel, we must not stick in the letter, but look to the cotemporaneous construction of the Courts. But if it is insisted that I am to give a literal construction to the Act of 1821, then I must carry out that literal construction to the Statute *de donis*, to which it refers.

But the true rule is, to seek diligently for the legislative mind and meaning in both cases and give effect to them. The preamble to the Act of 1821 shows what the evil was. It was not, as urged by Counsel, the want of some fixed, uniform rule of construction on these questions of remote limitations, to remedy which this Act was passed. The evil was, that estates tail having been abolished by the Constitution and by the Act of 1799, the Courts had differed as to the effect of that abolition upon clauses creating such estates —some holding that the conveyances themselves were void; others, that they vested a fee simple; and others, that they vested a fee-conditional. To remove these doubts, *and to prevent the defeating of the intention of the parties,* the Act of 1821 was passed, converting all estates tail into fee-simples. Here is the evil, here the remedy and here the legislative will. Now to impute to the authors of this law the *intention* of defeating *the intention of the parties* by prescribing

Gray and another *vs.* Gray *et al.*

the rule contended for, is to convict the General Assembly of a falsehood as well as a folly.

If, then, this is not the proper construction of the Act of 1821, the whole argument falls to the ground.

I have not seen proper to inquire whether, admitting this to be the proper construction of the Act, the other proposition is true, that under the English *decisions*, as to *realty*, the words of survivorship do not restrict the other words to a definite failure of issue, preferring to place my dissent distinctly upon the construction given to the Act of 1821. I cannot forbear, however, remarking that the case of *Pells vs. Brown*, (*Cro. Jac.* 590,) was a case of realty where the words " living W," were held to restrict the words, " dying without issue." And that this case was declared by Lord *Kenyon* to be the Magna Charta of this branch of the law. (*Porter vs. Bradley*, (3 *Term Rep.* 145.) And that the industry of Mr. *Lewis* has been able to find only two cases which seem to be adverse. And that his conclusion is, " that this legal interpretation of the word *survivors*," (viz : to mean *others*,) as applicable to limitations of real estates, " *rests upon general professional opinion, rather than an express judicial authority.*" (*Lewis on Perpetuities*, 222.) So that, so far as the case at bar is concerned, we should in no view of it be bound by any such fetters as would force us to shut our eyes to the plain, palpable and incontrovertible intention of the testator.